UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
CORA RAHMAN,

                                        Plaintiff,                    MEMORANDUM
                                                                      AND ORDER
                        -against-
                                                                      10 CV 921 (RML)
MUSEUM OF NATURAL HISTORY, CITY
OF NEW YORK and DISTRICT COUNCIL
37, AFSCME, AFL-CIO,

                                        Defendants.
----------------------------------------------------------X

LEVY, United States Magistrate Judge:

            Defendants move for summary judgment under Fed. R. Civ. P. 56 on all of

plaintiff's claims.  This matter is before me on consent of the parties, pursuant to 28 U.S.C. §

636.  I heard oral argument on August 1, 2011 (see Transcript of Oral Argument, dated Aug. 1,

2011 ("Tr.")) and have carefully considered all of the parties' submissions.  For the reasons

stated below, both motions are granted.

## BACKGROUND AND FACTS

            Plaintiff Cora Rahman ("plaintiff" or "Rahman") commenced this diversity action

in New York State Supreme Court, Queens County, on January 29, 2010.  On March 2, 2010,

defendants Museum of Natural History, City of New York (the "Museum") and District Council

37, AFSCME, AFL-CIO (the "Union") (collectively, "defendants") removed the case to this court.

The action alleges that plaintiff was wrongfully discharged from her position as a security guard at

the Museum in February 2007 because of her disability and in retaliation for her attempts to gain a

reasonable accommodation.  (See Amended Complaint, dated June 12, 2010 ("Am. Compl.").)  It

also alleges that the Union violated its duty of fair representation and that the Museum breached

the collective bargaining agreement between it and the Union.  (See id.)

The court assumes familiarity with the facts.[1]  Briefly, the Museum hired plaintiff as an attendant (security) guard on or about December 13, 1999.  (Id. ¶¶ 9, 10.)  When she was hired, she became a member of the Union and a party to the collective bargaining agreement ("CBA") between the Union and the Museum.  (See id. ¶ 8; Union Defendant's Statement of Material Facts Not in Dispute, dated Feb. 1, 2011 ("Union's Rule 56.1"), ¶ 3.)  On June 21, 2003, while plaintiff was working at the Museum, a patron physically attacked her.  (Am. Compl. ¶ 12.)  She sustained injuries from the attack (id. ¶ 15) and then she spent over a year absent from work on sick leave (see id. ¶¶ 17–20).  During this time, she underwent intensive chiropractic and physical therapy.  (Id. ¶ 19.)  On June 23, 2004, plaintiff returned to work.  (Id. ¶ 20.)

On May 4, 2005, plaintiff was injured on the job again, this time by a mechanical garage arm in the Museum's parking lot.  (Id. ¶ 21.)  She was subsequently placed on medical

---

[1] The following facts, upon which plaintiff's complaint is based, are undisputed or deemed admitted, unless otherwise noted.  Both defendants have served and filed a Statement of Material Facts Not in Genuine Dispute, in compliance with Local Civil Rule 56.1(a).  The rule states that upon any motion for summary judgment, "there shall be annexed to the notice of motion a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried."  Rule 56.1(b) then requires the party opposing summary judgment to include "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried."  Under Local Rule 56.1(c) all "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless specifically controverted by . . . the statement required to be served by the opposing party."  E.D.N.Y. Civ. R. 56.1(c); see also AAI Recoveries, Inc. v. Pijuan, 13 F. Supp. 2d 448, 449–50 (S.D.N.Y. 1998); Montalvo v. Sun Roc Corp., 179 F.R.D. 420, 421–23 (S.D.N.Y. 1998); T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).  In this case, plaintiff did not submit a response to either defendants' Rule 56.1 Statement.  However, courts are given "broad discretion to overlook a party's failure to comply with local rules" and may "opt to conduct an assiduous review on the record."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).  Therefore, facts that are disputed in plaintiff's memorandum of law will be deemed "contested" for purposes of this Memorandum and Order.

leave. (Id. ¶ 22.) By letter dated August 23, 2005, Dr. Charney D. Slater addressed a "Return to Work Order" to the Museum; he stated that Rahman was "ready to return to work on 8/31/05" and noted that she "will continue therapy at 2 times per week." (Affidavit of Diane Windholz, Esq., sworn to Jan. 31, 2011 ("Windholz Aff."), Ex. F.) Plaintiff returned to work on or about August 31, 2005. (Deposition of Cora Rahman, dated Oct. 18, 21, and 29, 2010 ("Rahman Dep."), annexed as Ex. A to the Windholz Aff., at 66.) To accommodate her physical therapy appointments, the Museum changed plaintiff's regularly scheduled days off from Monday and Friday to Tuesday and Friday. (Rahman Dep. at 175–76, 178.) In the months that followed plaintiff's return to work, the Union corresponded with the Museum in an attempt to modify plaintiff's work assignment. (See Rule 56.1 Statement, dated Jan. 31, 2011 ("Museum's Rule 56.1"), ¶¶ 12, 13; see also Windholz Aff., Exs. H, I.)

In January 2006, plaintiff had surgery on her arm related to one of her prior injuries; following the surgery, she was absent from work for about eight months. (Rahman Dep. at 232–33.) In a "Back to Work Certificate" dated September 25, 2006, Dr. Harshad C. Bhatt stated that plaintiff was still "[p]artially [i]ncapacitated" but could "go back to restricted duties at work . . . ." He also stated that

> [s]he is advised to avoid long periods of standing, lifting, bending without sitting down periodically. Patient needs Physical therapy two times a week. Patient needs ability to sit for 5–10 minutes every hour if she develops symptoms in her back and spine . . . .

(Declaration of Meaghean Murphy, Esq., dated Jan. 31, 2011 ("Murphy Decl."), Ex. 14.) Before plaintiff returned to work she met with Daniel Scheiner ("Scheiner"), the Museum's associate director of human resources, three times in September 2006. (See Affidavit of Daniel Scheiner

in Support of Defendant's Motion for Summary Judgment, sworn to Jan. 28, 2011 ("Scheiner Aff."), ¶ 3.)  On September 18, 2006, Scheiner offered plaintiff a schedule that included a paid lunch break and an additional half-hour unpaid break.  (Id. ¶ 4.)  Rahman rejected the schedule and instead requested that she be allowed to take a paid break whenever necessary.  (Id. ¶ 5.)  A week later, Scheiner presented four different schedules (which allowed plaintiff to choose between one, two, or three unpaid thirty-minute breaks per day) to plaintiff through her union representatives.  (Id. ¶ 8.)  On October 4, 2006, Steven Sykes ("Sykes"), the Union's assistant general counsel, advised Scheiner that plaintiff had accepted one of the four modified schedules, which allowed her one thirty minute unpaid break a day and a 37.5 hour work week.  (Id. ¶ 9.)

Plaintiff reported to work the following day but left work after advising Scheiner that she believed the Museum was breaking its agreement by not assigning her to one of six posts she had previously requested.  (Museum's Rule 56.1 ¶¶ 21, 22.)  Over the next few weeks, Scheiner negotiated with Sykes and other union representatives over plaintiff's post and schedule.  (See Scheiner Aff. ¶¶ 13, 14, 18.)  Plaintiff ultimately agreed to return to work on November 6, 2006 with a 37.5 hour weekly schedule with one unpaid thirty minute break each day.  (Museum's Rule 56.1 ¶ 28.)

On January 17, 2007, Scheiner and members of his staff met with plaintiff and Reggie Quadar, a Union representative.  (Scheiner Aff. ¶ 19; see also Windholz Aff., Ex. T.)  At the meeting, Scheiner advised plaintiff that she had called in sick on eighteen of the forty-nine work days since her return and gone home early on an additional four days.  (Scheiner Aff. ¶ 20.)  He also informed her that since the Museum had agreed to bring her back for a trial period, it would review whether the offered accommodation was working from its perspective.  (Museum's

Rule 56.1 ¶ 32.)

After review of plaintiff's attendance, the Museum determined that the offered accommodation was not working out. (Id. ¶ 33.) As a result, on February 14, 2007, Scheiner and Don Boyle met with plaintiff, Reggie Quadar, and Madonna Knight, another union representative; they proposed a reduced schedule of 22.5 hours a week. (Id.) By letter to Scheiner dated February 15, 2007, plaintiff rejected the proposed reduced work schedule. (Id. ¶ 35; see also Windholz Aff., Ex. U.) As a result, the Museum terminated plaintiff's employment on February 23, 2007. (Museum's Rule 56.1 ¶ 36.)

On February 26, 2007, plaintiff met with Knight and Sykes in Sykes's office. (Affirmation of Steven Sykes, Esq., dated Fed. 3, 2011 ("Sykes Aff."), ¶ 9.) Sykes and Knight stated that they would file a grievance of plaintiff's termination on her behalf and request a "Step II" hearing before a grievance committee made up of staff-level employees. (Id. ¶ 11; see also Murphy Decl., Ex. 30 at 14 (explaining the grievance procedure).) That same day Knight filed the grievance (Affidavit of Madonna Knight, sworn to Jan. 25, 2011 ("Knight Aff."), ¶ 15), and she represented plaintiff at the grievance hearing (id. ¶ 16). In a letter dated March 14, 2007, the Grievance Committee informed plaintiff that she had lost the hearing. (See Murphy Decl., Ex. 33.)

In May 2009, in response to an inquiry from Knight on whether plaintiff's grievance would proceed to arbitration, Robin Roach ("Roach"), associate general counsel for the Union's legal department (the "Legal Department"), authored a memorandum stating that the Legal Department had determined that plaintiff's case was not appropriate for arbitration. (Union's Rule 56.1 ¶¶ 22, 23; see also Murphy Decl., Ex. 27.) By letter dated June 1, 2009,

Knight informed plaintiff that the Legal Department had "determined the Museum had cause to discharge your services." (Murphy Decl., Ex. 27.) Knight attached a copy of Roach's memorandum to the letter. (Knight Aff. ¶ 22.) After receiving Knight's letter, plaintiff called Mary O'Connell, general counsel of the Legal Department, and requested an appointment. (Union's 56.1 ¶ 26.) On June 11, 2009, Roach and Knight met with plaintiff for approximately three hours, during which Roach gave plaintiff an opportunity to present information and documents concerning her workers' compensation proceedings.[2] (Id. ¶ 27; Affirmation of Robin Roach, Esq., dated Feb. 3, 2011 ("Roach Aff."), ¶¶ 7, 8.) About two weeks after the June 11, 2009 meeting, plaintiff called Knight, Mike Riggio, director of the Union's White Collar Division, and the Union's Executive Director Lillian Robert to protest the Union's decision not to take plaintiff's case to arbitration. (Union's 56.1 ¶ 30; see also Rahman Dep. at 358–60.)

Following these conversations, Roach drafted a second legal memorandum, dated August 27, 2009.[3] (Union's 56.1 ¶ 31.) By letter dated September 10, 2009, Knight again advised plaintiff that the Union would not proceed to arbitration, and she attached Roach's August 27th memorandum to the letter. (Windholdz Aff., Ex. X; see also Rahman Dep. at 337–39, 538.)

Presently, both defendants move for summary judgment on plaintiff's claims against them. They argue that plaintiff has not established prima facie cases for any of her causes of action.

_____

[2] The court will discuss these proceedings below.

[3] The memorandum reiterated the Union's position that the case was inappropriate for arbitration and contained more citations to prior arbitration decisions finding that offering a part-time schedule was a valid accommodation. (See Windholz Aff., Ex. X.)

A. <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." <u>Eastman Mach. Co. v. United States</u>, 841 F.2d 469, 473 (2d Cir. 1988) (citation omitted). It is well-settled that "[o]n a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried." <u>United States v. Rem</u>, 38 F.3d 634, 644 (2d Cir. 1994) (citations omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, there is sufficient evidence favoring the non-movant such that a reasonable jury could return a verdict in that party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The initial burden of establishing that no genuine factual dispute exists rests upon the party seeking summary judgment. <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 36 (2d Cir. 1994) (citation omitted). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). On the other hand, the nonmovant must provide more than conclusory allegations "and must point to specific evidence in the record to carry its burden on summary judgment." <u>Salahuddin v. Goord</u>, 467 F.3d 263, 273 (2d Cir. 2006) (citations omitted).

With these standards in mind, I will address each of plaintiff's claims in turn. Plaintiff's claims are as follows: First, she asserts that the Union breached its duty of fair representation and that the Museum breached the CBA between it and the Union. Second, she alleges that the Museum violated federal, state, and city anti-discrimination laws by failing to provide her with a reasonable accommodation and by terminating her in retaliation for her requests for such an accommodation.[4]

### B. Duty of Fair Representation Claim Against the Union

Plaintiff's only claim against the Union is that it breached its duty of fair representation. She does not state the basis for this claim in her amended complaint, but I will assume, as the Union did (without objection from plaintiff), that her purported cause of action arises under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, et seq.[5] The duty of fair representation requires a union "to serve the interests of all [of its] members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967) (citation omitted). The Union argues that it is entitled to summary judgment on plaintiff's breach of the duty of fair representation claim because plaintiff cannot make out a prima facie case and because the claim is untimely.

---

[4] In her amended complaint, plaintiff also asserted a claim under the Family Medical Leave Act, 29 U.S.C. § 2601, et seq. (Am. Compl. ¶¶ 193, 194.) However, plaintiff has since withdrawn this claim.

[5] "The federal duty of fair representation is inferred from Section 9(a) of the NLRA, which grants unions the exclusive right to bargain for all members of a designated unit." D'Onofrio v. City of New York, 07 CV 0731, 2010 WL 4673879, at *9 (E.D.N.Y. Sept. 14, 2010) (citing Vaca v. Sipes. 386 U.S. 171, 177 (1967)); see also Carrion v. Enter. Ass'n, 227 F.3d 29, 33 (2d Cir. 2000).

I will first address whether plaintiff has presented evidence of a prima facie case with respect to this claim. A claim for breach of the duty of fair representation consists of two elements. First, "a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." White v. White Rose Food, a Div. of DiGiorgio Corp., 237 F.3d 174, 179 (2d Cir. 2001) (citations omitted). Second, if a plaintiff establishes the first element of a duty of fair representation claim, he or she must then also demonstrate that there was "a causal connection between the union's wrongful conduct and [his or her] injuries." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998).

As to the first prong, plaintiff argues that the "Union acted in bad faith and in an arbitrary manner for more than two years as [it] sat on the Plaintiff's claims." (Plaintiff's Memorandum in Opposition, dated May 5, 2011 ("Pl.'s Mem."), at 8.) A union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (internal citation omitted). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 45–46 (1998). On the other hand, a showing of "[b]ad faith requires a showing of fraudulent, deceitful, or dishonest action." Sim v. N.Y. Mailers' Union No. 6, 166 F.3d 465, 472 (2d Cir. 1999) (citation omitted); see also Spellacy, 156 F.3d at 126 ("Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." (citations omitted).)

Plaintiff makes conclusory allegations that the Union's purported two-year delay

in informing her that it would not take her case to arbitration constitutes either arbitrary or bad faith action. (<u>See</u> Pl.'s Mem. at 8 ("The union's failure or refusal to advise Plaintiff that her case would not be arbitrated, during the first 27 months after termination should indeed be 'fairly characterized as so far outside of a wide range of reasonableness that it is wholly irrational or arbitrary.'"; <u>id.</u> at 10 (The Union's "conduct of remaining idle for more than two years was in bad faith . . . . because the Union already possessed Ms. Rahman's extensive file . . . and presumably all facts relevant to making a determination.").) However, plaintiff cites absolutely no legal support for the idea that a mere delay in making a decision constitutes arbitrary conduct. Even assuming that the Union needlessly delayed in either determining that it would not take Rahman's case to arbitration or in informing her of its decision—both of which are disputed allegations—plaintiff has introduced no evidence that it did so fraudulently, dishonestly, or in any fashion that was intended to mislead her.[6]

At best, plaintiff has offered evidence that the Union acted negligently or failed to process a grievance due to an error in evaluating the merits of plaintiff's arbitration case. However, "the duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." <u>Cruz v. Local Union No. 3 of Int'l Bhd. Of Elec. Workers</u>, 34 F.3d 1148, 1153–54 (2d Cir. 1994) (citations omitted). Because plaintiff has failed

_____

[6] At oral argument, plaintiff's counsel also stated that there was "some level of dishonest conduct" because Madonna Knight "was proactively telling [plaintiff] over and over again that her case was going to arbitration, and Ms. Rahman relied on that." (Tr. at 34.) Not only is there no support in the record for the notion that Knight ever (let alone repeatedly) informed Rahman that the Union would definitively take her case to arbitration but even if she had, plaintiff has not demonstrated that Knight purposely misled Rahman.

to establish that the Union's conduct toward plaintiff was arbitrary, discriminatory,[7] or in bad faith, it is unnecessary to address whether there was a casual connection between the Union's conduct and plaintiff's injuries, and her breach of the duty of fair representation claim is dismissed.

### C. Breach of Contract Claims

Counts one through six of the Amended Complaint are for breach of the CBA between the Union and the Museum. "It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement[,]" DelCostello v. Int'l Bhd. Of Teamsters, 462 U.S. 151, 163 (1983) (citation omitted), and breaches of a collective bargaining agreement constitute violations of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. See Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638, 227 F.3d 29, 33 (2d Cir. 2000). However, an employee "cannot bring a § 301 action against an employer unless he can show that the union breached its duty of fair representation in its handling of his grievance." Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564 (1990) (citing DelCostello, 462 U.S. at 163–64). As plaintiff has

---

[7] At oral argument, plaintiff indicated that she believes that the Union acted arbitrarily because she "knew someone who was precisely from her local, who also had a full-time job as an employee at the museum as a security guard, who got her arbitration way before Ms. Rahman, even though she was terminated a month after Ms. Rahman." (Tr. at 32.) Furthermore, "the merits of the other case was [sic] weaker than Ms. Rahman's case, in Ms. Rahman's opinion, but the union still randomly chose to arbitrate [the other individual's] case instead of Ms. Rahman's case." (Id. at 33.) Plaintiff mentioned this other worker, Corette Clarke, as well as another guard whose grievance was purportedly processed before hers, in her deposition. (See Rahman Dep. at 553–57.) She also included the arbitrator's decision on Clarke's claim as an exhibit. (See Affirmation of Devian Daniels, Esq., dated Apr. 28, 2010, Ex. XX.) However, plaintiff has neither provided evidence regarding the time it took the Union to inform the other guards of its decision on arbitration nor demonstrated that she was similarly situated to them.

failed to establish a prima facie case that the Union breached its duty of fair representation, she

cannot establish a hybrid § 301 claim either.  Therefore, plaintiff's breach of contract claims

against the Museum are dismissed.[8]

### D. Plaintiff's Disability Claims

Plaintiff next asserts disability discrimination claims under the following statutes:

the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 1201, et seq., section 504

of the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq., the New York State Human Rights

Law ("NYSHRL"), N.Y. Exec. Law § 296(1)(a), and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8–107(1)(a).[9]  The Museum argues that it is entitled to

summary judgment on all of these claims because plaintiff can neither establish a prima facie

case of disability discrimination nor rebut the Museum's non-discriminatory reason for

terminating her (absenteeism).

### 1. Federal and State Claims

Under the ADA, a plaintiff makes out a prima facie case of disability

discrimination arising from a failure to accommodate by showing each of the following:

> (1) plaintiff is a person with a disability under the meaning of the
> ADA; (2) an employer covered by the statute had notice of his
> disability; (3) with reasonable accommodation, plaintiff could
> perform the essential functions of the job at issue; and (4) the
> employer has refused to make such accommodations.

---

[8] Because plaintiff's breach of duty of fair representation and breach of contract claims
fail on the merits, it is unnecessary for the court to determine whether they are time-barred.

[9] Plaintiff also purports to sue under § 8-502A of the New York City Administrative
Code.  However, as § 8-502A merely gives a person a cause of action under the New York City
Human Rights Law, this claim is identical to plaintiff's claim under the NYCHRL.

Rodal v. Anesthesia Group of Onondaga, P. C., 369 F.3d 113, 118 (2d Cir. 2004) (citation omitted).[10]  Although "disability" is defined differently under NYSHRL, the same legal standards govern NYSHRL and Rehabilitation Act claims as govern ADA claims.  See Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 n.3 (2d Cir. 2006) (NYSHRL); Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1998) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.").  For purposes of this motion, the Museum does not dispute that plaintiff had a disability (of which it had notice) at the time of her termination and that it was covered by the relevant statutes.  Accordingly, plaintiff's Rehabilitation Act and NYSHRL claims "survive[] or fail[] on the same basis" as her ADA claim."  Gingold v. Bon Secours Charity Health Sys., 768 F. Supp. 2d 537, 543 n.6 (S.D.N.Y. 2011) (quoting Graves, 457 F.3d at 184 n.3).

Here, the parties agree (and the record makes clear) that plaintiff informed the Museum that she needed an accommodation.[11]  "Once the plaintiff establishes that [s]he has requested an accommodation . . . a duty is triggered on the part of the employer 'to investigate that request and determine its feasibility.'"  Id. at 543 (quoting Parker v. Columbia Pictures

_____

[10] Once a plaintiff makes out this prima facie case, "a rebuttable presumption of discrimination arises.  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision."  Attis v. Solow Realty Dev. Co., 522 F. Supp. 2d 623, 627 (S.D.N.Y. 2007) (citation omitted).  "If the employer articulates such a reason, the presumption of discrimination 'simply drops out of the picture,' and the burden shifts back to the plaintiff to show, without the benefit of any presumption, that, more likely than not, discrimination was a motivating factor in the employer's adverse decision."  Id.  (internal citations and punctuation omitted).

[11] "[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  Graves, 457 F.3d at 184 (quoting 29 C.F.R. pt. 1630, app. at 363 (2003)).

Indus., 204 F.3d 326, 338 (2d Cir. 2000) and citing Jackan v. N.Y. State Dep't of Labor, 205

F.3d 562, 568 n.4 (2d Cir. 2000)).  "These responsibilities conform to the 'interactive process'

envisioned by the ADA, in which 'employers and employees work together to assess whether an

employee's disability can be reasonably accommodated.'" Id. (quoting Jackan, 205 F.3d at 566).

"In evaluating a claim for failure to accommodate, therefore, 'courts should attempt to isolate the

cause of the breakdown [of the interactive process] and then assign responsibility.'" Id. (quoting

Beck v. Univ. of Wisc. Bd. of Regents, 75 F.3d 1130, 1135–36 (7th Cir. 1996)).  "[A]n employer

need not accept an employee's requested accommodation, including a request for reassignment,

if the employer offers a reasonable accommodation of its own." Ragusa v. United Parcel Srv.,

No. 05 Civ. 6187, 2008 WL 612729, at *5 (S.D.N.Y. Mar. 3, 2008) (citing Norville v. Staten

Island Univ. Hosp., 196 F.3d 89, 99 (2d Cir. 1999); EEOC v. Yellow Freight Sys., Inc., No.

98-2270, 2002 WL 31011859, at *21 (S.D.N.Y. Sept. 9, 2002)).  Here, the crux of the Museum's

argument is that plaintiff's discrimination claim must fail because it provided plaintiff with at

least two such accommodations, including the final part-time schedule that she rejected.

In fact, the record clearly demonstrates that following plaintiff's January 2006 arm

surgery and her subsequent leave, she and the Museum engaged in an interactive process to

determine appropriate accommodations.[12]  As a result of this process, the Museum offered

plaintiff two accommodations: a 37.5 hour weekly schedule (which she accepted) and after

_____

[12] As detailed above, Daniel Scheiner conferred with plaintiff and her union
representatives numerous times in September and November 2007 until plaintiff ultimately
agreed to a 37.5 hour work schedule with one unpaid thirty minute break each day.  (See
Scheiner Aff. ¶¶ 3, 8, 9.)  Moreover, this interactive process seems to have begun even before
plaintiff's arm surgery, as after plaintiff's second on-the-job injury, the Museum changed her
regularly scheduled days off to accommodate her physical therapy appointments.  (See Rahman
Dep. at 175–76, 178.)

plaintiff struggled to maintain her attendance with this schedule, a reduced schedule of 22.5 hours a week.  Nonetheless, plaintiff makes three arguments as to why summary judgment is inappropriate: (1) the Museum should be collaterally estopped from arguing that it provided a reasonable accommodation to plaintiff; (2) the Museum's 37.5 hour schedule failed to comport with the restrictions of plaintiff's physician; and (3) the Museum's proposed 22.5 hour schedule was unreasonable as a matter of law.  I will briefly address each in turn.

Plaintiff first argues that the Museum should be estopped from arguing that it provided a reasonable accommodation to plaintiff because the "identical issue was specifically, actually and necessarily decided at [a] New York State Worker's Compensation hearing . . . ." (Pl.'s Mem. at 11.)  In a written decision dated October 14, 2008, the State of New York Workers' Compensation Board ("WCB" or the "Board") affirmed a Workers' Compensation Law Judge's decision that plaintiff was eligible for workers' compensation benefits and in so doing found that, contrary to the Museum's assertion, she did not voluntarily leave the work force.[13]  (See Affirmation of Devian Daniels, Esq., dated Apr. 28, 2010 ("Daniels Aff."), Ex. V.) Specifically, the Board "note[d] that the employer witness [Scheiner] actually admitted that the position created for the claimant, as an accommodation, did not actually comport with the medical restrictions indicated by the claimant's treating physician."  (Id., Ex. V at 2.)

Plaintiff essentially argues that the WCB's conclusion that she did not voluntarily

---

[13]  After a hearing to determine whether plaintiff was entitled to workers' compensation benefits, a Workers' Compensation Law Judge found, on May 6, 2008, that plaintiff had not voluntarily removed herself from the labor market.  (Affirmation of Devian Daniels, Esq., dated Apr. 28, 2010, Ex. V at 1.)  Under New York law, "[a]n award of compensation is improper if the sole cause for a claimant's loss of earnings is his or her voluntary withdrawal from the labor market."  Kucuk v. Hickey Freeman Co., 909 N.Y.S.2d 831, 834 (3d Dep't 2010) (citations omitted).

leave the workforce is tantamount to a finding that the Museum did not provide her with a reasonable accommodation and should therefore be given preclusive effect as to that question. However, "it is well established that state administrative proceedings not reviewed by state court[s] do not have preclusive effect on an ADA claim." Greenberg v. New York City Transit Auth., 336 F. Supp. 2d 225, 241 (E.D.N.Y. 2004). With respect to plaintiff's other claims, federal courts must give a state agency acting in a judicial capacity "the same preclusive effect to which it would be entitled in the State's courts" as long as "the parties have had an adequate opportunity to litigate." DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 116 (2d Cir. 1987) (citations omitted). Under New York law, collateral estoppel gives conclusive effect to an administrative agency's determination where: (1) the issue sought to be precluded is identical to a material issue necessarily decided by the administrative agency; and (2) there was a full and fair opportunity to contest the issue. Jeffreys v. Griffin, 801 N.E.2d 404, 407 (N.Y. 2003) (citations omitted).

In this case, plaintiff argues that the first prong is met because "[a] material issue that workers comp board [sic] had to figure out was whether or not Ms. Rahman was properly accommodated and whether she took herself out of the work force voluntarily, because . . . if . . . she had been properly accommodated, then her leaving the job . . . would mean that she voluntarily left the work force." (Tr. at 48.) However, where a claimant has a partial disability, the question of whether he or she has voluntarily withdrawn from the labor force is not whether the employer provided him or her with a reasonable accommodation but whether the claimant had a "reasonable basis" to refuse to accept "light duty work" that was offered to him or her. See Torrance v. Loretto Rest Nursing Home, 876 N.Y.S.2d 253, 255 (3d Dep't 2009) ("Although a

claimant who suffers from a partial disability must generally accept light duty work within his or

her ability in order to receive workers' compensation benefits and not be considered to have

voluntarily withdrawn from the labor market, this is not the case if there is a reasonable basis for

the claimant's refusal to accept the light duty work." (internal citations omitted)).  In other words,

the WCB could properly find that Rahman acted reasonably under state law in refusing to accept

what constituted a reasonable accommodation under the ADA.  Thus, the question before the

WCB was by no means "identical" to the question of whether the Museum provided plaintiff

with a reasonable accommodation, and the Museum should not be estopped from arguing that it

offered plaintiff such an accommodation.[14]  Cf. Ragusa, 2008 WL 612729, at *6 (declining to

give preclusive effect in a NYSHRL and NYCHRL action to the WCB's finding that a plaintiff

voluntarily withdrew from the workforce because a jury could still find that an alternative

position he was offered was not a reasonable accommodation).

        Second, plaintiff argues that summary judgment is not appropriate because the

accommodations offered to plaintiff did not comport with her physician's restrictions.  (See Pl.'s

Mem. at 12.)  According to plaintiff, while her physician wrote restrictions that mandated that

she be allowed to sit every five to ten minutes per hour of standing, the 37.5 hour schedule that

the Museum offered her required plaintiff to stand on her feet for one-and-a-half to two hours

---

[14] Moreover, as the Museum highlights (see Tr. at 48, 50), the vastly different nature of a workers' compensation proceeding from a discrimination action—including very limited discovery—also militates toward finding that there was not a full and fair opportunity to contest the issue.  See Ragusa, 2008 WL 612729, at *6 (finding that the plaintiff "did not have a full and fair opportunity to contest the issue of whether [his employer] provided him with a reasonable accommodation").  Finally, while the court was not provided with Scheiner's testimony at the workers' compensation hearing regarding whether the postings that the Museum offered comported with the physician's note, as explained below, I do not believe that these postings were inconsistent with the note.

straight several times a day. (Id. (citing Daniels Aff., Ex. I).) However, the physician's note does not require that plaintiff sit for five to ten minutes per hour of standing; rather, it states that she "needs ability to sit for 5–10 minutes every hour *if she develops symptoms in her back and spine* . . . ." (Daniels Aff., Ex. I (emphasis added).) Moreover, as plaintiff has conceded, human resources professionals at the Museum advised her that if she needed to take a break, she was to call someone to relieve her. (Tr. at 8, 27.) Plaintiff argues that, the agreement aside, her supervisors reacted poorly to her requests for breaks and were not in fact willing to comply with her doctor's directives that she be given a break whenever needed. (Id. at 26–28.) The only evidence in the record that supports plaintiff's statement is an internal memorandum dated December 27, 2006 from Don Boyle to Dan Scheiner regarding plaintiff's performance (the "Performance Evaluation"). The Performance Evaluation documents every instance in which plaintiff called in sick or took an unscheduled break (whether authorized or not).[15] (See Daniels Aff., Ex. VI (the "Performance Evaluation"). While it expresses general frustration on Boyle's part concerning plaintiff's performance and attitude[16] and concern about her back pain, it provides no support (even by inference) for plaintiff's claim that her supervisors did not provide her with unscheduled breaks as needed. In fact, the natural conclusion from reading the document is that plaintiff's supervisors repeatedly complied with these requests and only became

---

[15] A sample entry from December 3, 2006 is: "At 11:05 A.M. went on accommodation break, returned at 12:17 PM (42 minutes)[.]" (Performance Evaluation at 2.)

[16] For example, Boyle states that "[e]ach day a manager must endure daily complaints regarding her assigned posts." (Performance Evaluation at 3.)

upset when she was disrespectful or failed to ask permission before taking a break.[17]

Third, plaintiff argues that the 22.5 hour schedule was an unreasonable accommodation because it would result in a reduction in her benefits and salary yet require her to remain at work for a full day. (See Pl.'s Mem. at 15–16; see also Tr. at 31.) As a threshold matter, plaintiff is mistaken in her assertion that she would be required to be at the Museum each day from 9:15 a.m. until 5:45 yet be paid for only 4.5 hours. (See Pl.'s Mem. at 15–16.) As her own exhibit makes clear (see Daniels Aff., Ex. XVII), plaintiff would be at work from 9:15 a.m. until 3:45 p.m. While Rahman fails to provide any specific details concerning what her salary and benefits had been and would have been following the reduction in hours,[18] there are no disputed questions of fact as to these issues.[19] As a result, it is up to the court to determine whether the proposed schedule was a reasonable accommodation.

Here, the Museum first offered plaintiff a modified 37.5 hour schedule. When it was clear that schedule was not working for plaintiff, the Museum offered her a schedule commensurate with the hours she had been able to work. Plaintiff herself desired to take a break

---

[17] Plaintiff also ignores the fact that she originally accepted the 37.5 hour work schedule and that the Museum subsequently offered her a different, part-time schedule that included breaks every hour.

[18] Plaintiff makes a conclusory statement that "[u]nder a 22.5-hour schedule, Plaintiff would face a significant reduction in pay and benefits[,]" (Pl.'s Mem. at 15), but she does not identify any specifics regarding the change. With respect to change in salary, she references only a chart demonstrating which of her hours were be paid under the part-time schedule. (See Pl.'s Mem. at 15 (citing Daniels Aff., Ex. XVIII).) However, the chart, which is actually Exhibit XVII, does not provide any salary information. In addition, plaintiff offers no evidence regarding what the change in her benefits would have been under that schedule.

[19] The Museum acknowledges that a reduction of both pay and some of her benefits would have accompanied the part-time schedule.

every hour, and the modified 22.5 hour schedule would have allowed her to do that at her existing position. Neither case that plaintiff cites supports the notion that an accommodation to an existing position is unreasonable simply because it results in a reduction in benefits and salary or requires an individual to take unpaid breaks during the work day.[20] On the other hand, the ADA explicitly states that a reasonable accommodation may include "part-time or modified work schedules[,]" 42 U.S.C. § 12111(9), and "[t]he ADA does not require an employer to pay an employee working a partial shift full-time wages." Willett v. State of Kan., 942 F. Supp. 1387, 1395 (D. Kan. 1996) (citation omitted), aff'd, 120 F.3d 272 (10th Cir. 1997); cf. EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disability Act, No. 925.002 (Oct. 17, 2002) (stating that if an employee is reassigned to a lower level position, an employer does not have to maintain his salary unless the employer transfers employees without disabilities to lower level positions and maintains their original salaries). Thus, I find that the modified schedule that plaintiff rejected was a reasonable accommodation.

"Employees are not entitled to hold out for the most beneficial accommodation, and the employer need not offer the accommodation that the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends." Waltzer v. Triumph

---

[20] Plaintiff cites Guice-Mills v. Derwinski, 967 F.2d 794, 798 (2d Cir. 1992), which holds that an alternative position "that does not require a significant reduction in pay and benefits" is a "'reasonable accommodation' virtually as a matter of law." However, the case says nothing of the opposite situation, where there is a reduction in pay and benefits. Moreover, this case differs from Guice-Mills in that the Museum offered plaintiff a part-time schedule for her former position rather than offering her an alternative position. In a supplemental submission, plaintiff also cites Serino v. Potter, 178 Fed. App'x 552, 555 (7th Cir. 2006). Serino is not a case about reduced pay and nothing in the decision suggests that a part-time schedule that results in a reduction in pay and benefits can never be a reasonable accommodation.

Apparel Corp., No. 09 Civ. 288, 2010 WL 565428, at *6 (S.D.N.Y. Feb. 18, 2010) (internal

citations and punctuation omitted).  Therefore, plaintiff's ADA, Rehabilitation Act, and

NYSHRL claims are dismissed.

2. City Claim

Plaintiff has failed to allege that her NYCHRL claim should be analyzed

differently from her other disability discrimination claims.  However, "the Local Civil Rights

Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) (the 'Restoration Act'), amended the

NYCHRL to, in part, 'abolish parallelism between the [NYCHRL] and federal and state

anti-discrimination law.'"  Margherita v. FedEx Exp., No. 07 CV 4826, 2011 WL 5024577, at *7

(E.D.N.Y. Oct, 20, 2011) (quoting Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d

Cir. 2009)).  As a result, NYCHRL claims must be given "an independent liberal construction . .

. ."  Loeffler, 582 F.3d at 278 (quoting Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 31 (1st

Dep't 2009).  "The independent analysis must be targeted to understanding and fulfilling . . . the

[NYCHRL's] 'uniquely broad and remedial' purposes, which go beyond those of counterpart

State or federal civil rights laws."  Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d at 31 (quoting

N.Y.C. Admin. Code § 8–130).  However, for discrimination claims under the NYCHRL, courts

continue to apply the same three-step, burden-shifting framework as they use for federal and New

York state discrimination claims.  See, e.g., Williams v. Regus Mgmt. Group, LLC, No. 10 Civ.

8987, 2011 WL 6073560, at *7 (S.D.N.Y. Dec. 6, 2011).

"One effect of the 2005 amendment is that the requirement that an adverse

employment action be materially adverse to the plaintiff has been eliminated.  Discrimination in

'any manner' is now prohibited by the [NYCHRL]."  Margherita, 2011 WL 5024577, at *8

(internal citations omitted). "Nonetheless, a plaintiff must still link the adverse employment action to a discriminatory motivation[,] and [w]here [a] plaintiff fails to do so, his claims . . . fail." Id. (citing Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d at 34–35). Here, as discussed above, plaintiff has failed to allege any facts that satisfy her initial prima facie burden and give rise to an inference of discrimination. As a result, like her ADA, Rehabilitation Act, and NYSHRL claims, her NYCHRL claim must also fail.

E. Retaliation Claims

Plaintiff also alleges that the Museum terminated her in retaliation for complaining about the Museum's refusal to provide her with reasonable accommodations. Plaintiff does not specify in her complaint the law or laws upon which she is relying, so the court will assume that she is relying on the same four statutes upon which she bases her discrimination claims.

1. Federal and State Retaliation Claims

To establish a prima facie case of retaliation under the ADA, Rehabilitation Act, and NYSHRL, a plaintiff must establish that (1) she was engaged in protected activity; (2) her employer was aware of her participation in protected activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer. Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000) (ADA); Treglia v. Town of Malius, 313 F.3d 713 719 (2d Cir. 2002) ("The Rehabilitation Act and NYSHRL contain similar provisions against retaliation and are governed in this respect by the same standards as the ADA." (citations omitted)).

The Museum argues that summary judgment is appropriate on plaintiff's

retaliation claims because plaintiff has presented no evidence of a causal connection between her protected activity and the adverse action (her termination). (Memorandum in Support of Motion for Summary Judgment, dated Jan. 31, 2011, at 28.) "A causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991) (citation omitted).

Plaintiff claims that the Performance Evaluation, which was written on December 27, 2006, less than two months before plaintiff's termination, is evidence of a causal connection. (Pl.'s Mem. at 18–19.) Specifically, she contends that "[t]he Museum's own internal notations corroborate that behind the scenes the managers and decision-makers at defendant Museum were noticing and documenting each and every time the Plaintiff 'complained' about their failure to provide reasonable accommodations to her." (Id. at 18 (citing the Performance Evaluation).) According to plaintiff, these "unmistakable writings . . . raise numerous material issues of facts that should be resolved by the factfinder . . . ." (Id. at 19)

The court disagrees. While the Performance Evaluation establishes that plaintiff's supervisors documented complaints she made regarding her position and her health, it provides little, if any, support for plaintiff's assertion that the supervisors complained about her requests for accommodations. As purported evidence of a retaliatory animus, it is "both minimal and ambiguous, and in light of the overall record, insufficient to create a genuine issue of fact." Dayes v. Pace Univ., 2 Fed. App'x. 204, 208 (2d Cir. 2001) (affirming the granting of summary

judgment on the plaintiff's retaliation claims).   Therefore, plaintiff's federal and state retaliation claims are dismissed.

### 2. City Claim

The NYCHRL has a broader standard for retaliation claims than the NYSHRL and the federal statues.  See Dixon v. Int'l Fed'n of Accountants, 416 F. App'x. 107, 110 n.1 (2d Cir. 2011) (citations omitted).  To establish a retaliation claim under this more liberal standard, the analysis is similar to that of the federal and state law analysis, but the employee need not suffer "a materially adverse change in the terms and conditions of employment[.]"  Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d at 34.  Retaliation in "any manner" will suffice but a plaintiff must still link the adverse action to a "retaliatory motivation."  Id. at 34–35.  However, the NYCHRL's more liberal standard has no impact here: plaintiff has "failed to link any action on behalf of Defendant to a retaliatory motivation" related to her disability.  Kaur v. N.Y.C. Health & Hosps. Corp., 688 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (citing Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d at 34–35).  Thus, she has failed to state a claim for disability discrimination or retaliation under the NYCHRL and, accordingly, the claim is dismissed.

## CONCLUSION

For the reasons stated above, defendants' motions for summary judgment are granted.  The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: Brooklyn, New York
March 30, 2012

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge
